**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOHAMMED "MOE" DIAB,<br><br><div align="center">Defendant.</div> | No. 1:21-cr-10250-NMG |

**MOHAMMED DIAB'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR RECUSAL**

Maksim Nemtsev (Mass. Bar No. 690826)
20 Park Plaza, Suite 1000
Boston, MA  02116
Telephone: (617) 227-3700
menemtsev@gmail.com

Justin V. Shur (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  (202) 556-2000
Facsimile:   (202) 556-2001
jshur@mololamken.com

Kenneth E. Notter III (*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street, Suite 5350
Chicago, IL  60654
Telephone:  (312) 450-6700
Facsimile:   (312) 450-6701
knotter@mololamken.com

*Attorneys for Mohammed Diab*

## INTRODUCTION

We do not make this motion lightly, but the facts and the law leave no other option.  The Court must recuse itself from this case for two independent reasons.  *First*, the Court crossed Rule 11's bright-line prohibition against judicial involvement in plea discussions by, among other things, identifying a hypothetical plea deal the Court would accept and directing the parties to submit that acceptable plea or proceed to trial.  *Second*, given the Court's comments during the December 19 hearing where it rejected the parties' proposed plea agreement, the Court's "impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  For either or both reasons, recusal is required.

## BACKGROUND

### I.   THE PARTIES REACH A PLEA AGREEMENT UNDER RULE 11(c)(1)(C)

In July 2024, the government offered Mr. Diab a plea deal under which he would plead guilty to conspiracy to commit bank fraud.  Notter Decl. ¶ 2.  The offer was "wired" to the substantively identical offer made to Mr. Diab's co-defendant, Amy Rountree, meaning the offer was void if either Mr. Diab or Ms. Rountree did not accept.  *Id.* ¶ 3.

The parties eventually reached an agreement.  Mr. Diab and Ms. Rountree each agreed to plead guilty to conspiracy to commit bank fraud and waive their appellate rights in exchange for a stipulated sentence under Rule 11(c)(1)(C) of one year's supervised release.  Dkt. 224 at 3; Dkt. 241 at 3; *see* Notter Decl. ¶ 4.  Mr. Diab, but not Ms. Rountree, also agreed to pay a $15,000 fine.  Dkt. 224 at 3.  Three separate leadership groups within the Department of Justice—the U.S. Attorney's Office for the District of Massachusetts, Main Justice's Fraud Section, and Main Justice's Money Laundering and Asset Recovery Section—independently approved the agreement.  *See id.* at 5-6.

At the change-of-plea hearing, the government explained that a noncustodial sentence was appropriate for Mr. Diab for two main reasons. *First*, the government deemed it significant that Mr. Diab "did not personally profit" from the conspiracy. Dkt. 232 at 8:11-18. *Second*, the government noted the "legal risk associated with the theory on which the government charged the case" given that "five or six circuits . . . have viewed fraud . . . differently than the government does" and a case pending before the Supreme Court "throws into some question the theory of prosecution in a case where there is deception but not the intent to economically injure a victim." *Id.* at 8:11-10:2. Under those circumstances, the government explained, the "certainty" and "finality" of obtaining a felony conviction justified a noncustodial sentence. *Id.* at 9:12-10:2. The Court "conditionally accept[ed]" Mr. Diab's plea pending "review [of] the presentence report." *Id.* at 22:6-8, 23:1-2.

## II.  BEFORE ACCEPTING OR REJECTING THE PLEA, THE COURT CAUSES THE PARTIES TO RENEGOTIATE AND REVISE THE AGREEMENT

In November, the Court entered a notice of "its intention to reject" Mr. Diab's plea agreement. Dkt. 242 at 1. The Court stated that it had considered "the sentencing factors enumerated in 18 U.S.C. § 3553(a)" and determined that "a time served sentence [was] insufficient to achieve the goals of sentencing." *Id.* But rather than reject the plea, the Court "instructed" the parties to file papers defending the plea agreement within two weeks. *Id.*

In separate filings, the parties defended the agreement as a just resolution to an unusual case. *See* Dkts. 243, 244. The government emphasized that its "investigation did not identify any actual or intended pecuniary harm." Dkt. 243 at 1. Nor did Mr. Diab "profit personally" from the alleged scheme. *Id.* at 2. That lack of personal gain and the "absence of pecuniary harm (and actual profit to the deceived and defrauded parties) ma[de] this case different from one in which a

defendant deprives the victim of money or property," the government explained. *Id.* at 1; *see also* Dkt. 255 at 4 (similar).

Behind the scenes, however, the Court's notice of "its intention to reject" the agreement had sparked plea negotiations that would not have otherwise occurred. Notter Decl. ¶ 6. The notice was, in effect, an advisory opinion telling the parties that—if they did not preemptively amend the agreement to make it more punitive—the Court would reject it. *See* Dkt. 242 at 1. The implication was that there was a different, hypothetical agreement the Court preferred, and the conditional threat of rejection acted as a lever to induce the parties to amend their agreement to please the Court. *See* Notter Decl. ¶¶ 6-7. All future plea discussions necessarily occurred not only in the shadow of the Court's stated belief that the agreement was too lenient, but also with the looming threat that the Court would reject the agreement if it weren't amended. *Id.* The notice thus made the Court an active participant in plea discussions in a way an outright rejection would not have. Indeed, it was understood that the ensuing discussions were a negotiation with the Court, not the government. *Id.* ¶ 6.

The Court's notice also put the parties in an impossible situation. They believed the agreement they negotiated was a just resolution to an unusual case. And the Court had not rejected that agreement, leaving hope that the added information in the presentence report and sentencing memoranda would show the Court the agreement was justified. The threat of rejection thus forced Mr. Diab to either (1) risk rejection by standing on the deal he'd reached with the government, or (2) preemptively (and perhaps unnecessarily) increase his own punishment to satisfy the Court's stated intention.

The plea discussions the notice incited ultimately resulted in a proposed amended plea agreement on December 18, the day before Mr. Diab's sentencing hearing. Notter Decl. ¶ 7. The

proposed amended agreement increased the punishment to include up to six months' home confinement. *Id.* Mr. Diab received nothing in exchange. The Court's intervention was the sole reason Mr. Diab agreed to the term of home confinement. *Id.* At the Court's request, the government emailed the Courtroom Deputy a redline copy of the proposed amended agreement. *Id.* ¶8; *see* Dkt. 271 at 3:25-4:1 (noting Court "received a preliminary copy").

## III.    THE COURT DEFINES THE TERMS OF AN "ACCEPTABLE" PLEA, AND INVITES THE PARTIES TO NEGOTIATE FURTHER

At the sentencing hearing, the Court read prepared remarks explaining its decision to reject the parties' agreement. Notter Decl. ¶¶9-10; *see* Dkt. 271 at 4:5-7:5 (prepared remarks explaining decision). In explaining its decision, the Court described the alleged conspiracy as one to "fraudulently induce[] financial institutions . . . to loan money to disreputable borrowers." Dkt. 271 at 4:11-16. *But see* Dkt. 150 (indictment lacks any such allegation). It rejected the presentence report's finding and "the parties' assertion that there was no intended or actual loss in this case"; instead, it stated that Mr. Diab "knew his actions would cause [harm]" and insisted that Mr. Diab "denied the banks the higher transaction fees that otherwise would have been properly charged." Dkt. 271 at 5:20-21, 6:16-20, 4:19-22. It accused Mr. Diab of engaging in "an elaborate scheme" to obstruct justice and working for a company "engaged solely in illegal criminal conduct, so every dollar [he] received as part of his salary was ill-gotten." *Id.* at 5:4-12. And it insisted "there were other unnamed victims of this crime, namely, legitimate small businesses that were deprived of commercial loans because the banks had already loaned $150 million dollars to fictitious entities," though it purported not to reject the plea on that basis. *Id.* at 4:23-5:3.

The government tried to correct the Court's mistaken beliefs. It stated that its investigation "did not unearth evidence" that any small businesses "did not get funding" because money had supposedly been loaned "to sham merchants in the manner the Court described." Dkt. 271 at 7:22-

8:6.  Nor did the "government's investigation reveal[ ]" that Mr. Diab's employer, Allied Wallet, was "engaged solely in illegal conduct," as the Court claimed.  To the contrary, the government noted, Allied Wallet had "a substantial number of [legitimate] customers" and "a significant portion" of its revenues "were properly earned."  *Id.* at 10:5-18.  The government's multiyear investigation also showed no evidence that the conspiracy "denied banks fees" as the Court alleged, or contemplated or inflicted any other "pecuniary harm."  *Id.* at 8:7-9:7.  In fact, the government explained, the lack of intended or actual harm (or gain to Mr. Diab) was "one of the reasons that the government felt that a variant sentence would be appropriate."  *Id.* at 9:8-11.  The Court was unmoved.  *See id.* at 10:19-11:10.

The Court also went beyond explaining its decision to reject the plea agreement.  It went on (again reading prepared remarks) to identify the agreement that "the Court ***would*** accept."  Dkt. 271 at 7:6-19 (emphasis added); *see* Notter Decl. ¶10.  It said: "the Court would accept an agreed-upon sentence substantially below the low end of the applicable guideline range but not a sentence without at least a number of months of incarceration, followed by some period of home confinement."  Dkt. 271 at 7:9-13.  To ensure there was no misunderstanding, the government repeated at the hearing that it "hear[d] the Court to be saying it would accept a sentence" that "included a term of incarceration, followed by a period of home confinement."  *Id.* at 9:14-17.  There was no misunderstanding.  And the Court gave "the parties until close of business on Monday, December 23" to submit a "further revised (C) plea" or "to set a date for trial."  *Id.* at 7:14-19; *see* Dkt. 258 (shortening deadline to noon on December 23).

On December 20, as the Court directed, the parties tried to reach the agreement the Court proposed.  Dkt. 259 ¶¶3-4; Notter Decl. ¶11.  The Court's statement that it "would accept" a certain sentence (and its other comments during the December 19 hearing) both constrained and

dominated the parties' discussions. Notter Decl. ¶¶ 11-12. The Court's proposed plea agreement (and other comments) also significantly altered and hindered Mr. Diab's decision-making. *Id.* ¶ 12. As the parties jointly reported on December 22, they were unable to reach the agreement the Court deemed acceptable (*i.e.*, one that "include[d] a term of months of incarceration"). Dkt. 259 ¶ 4.

## ARGUMENT

**I.  RECUSAL IS REQUIRED BECAUSE THE COURT VIOLATED RULE 11'S ABSOLUTE BAN ON JUDICIAL INVOLVEMENT IN PLEA DISCUSSIONS**

Rule 11's command is simple and emphatic: "The court must not participate in [plea] discussions." Fed. R. Crim. P. 11(c)(1). That prohibition is "categorical." *United States v. Tobin*, 676 F.3d 1264, 1306 (11th Cir. 2012); *United States v. Baker*, 489 F.3d 366, 373 (D.C. Cir. 2007) (same); *United States v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998) (same); *United States v. Werker*, 535 F.2d 198, 201 (2d Cir. 1976) (similar); *United States v. Schneider*, 40 F.4th 849, 853 (8th Cir. 2022) ("absolute prohibition"); *In re United States*, 32 F.4th 584, 593 (6th Cir. 2022) (similar); *United States v. Kyle*, 734 F.3d 956, 959 (9th Cir. 2013) (similar); *United States v. Miles*, 10 F.3d 1135, 1139 (5th Cir. 1993) (similar). It is "a bright line rule that prohibits the participation of the judge in plea negotiations under any circumstances and admits of no exceptions." *United States v. Harrell*, 751 F.3d 1235, 1239 (11th Cir. 2014) (alterations omitted); *see In re United States*, 32 F.4th at 594 ("no good motives exception").

That absolute bar on judicial involvement in plea discussions serves core values. Any amount of "judicial involvement" carries "the high and unacceptable risk of coercing a defendant to accept the proposed agreement." *United States v. Bierd*, 217 F.3d 15, 19 (1st Cir. 2000) (brackets omitted). A judge, "by virtue of her office, can never engage in plea negotiations as a co-equal participant." *Kraus*, 137 F.3d at 452. "Judicial participation of any kind is [thus]

'inherently coercive[.]'" *In re United States*, 32 F.4th at 593. Rule 11's bright-line ban also preserves the court's "impartiality and objectivity." *Bierd*, 217 F.3d at 19. It is only human for a judge to "feel personally involved" and "resent the defendant's rejection of his advice" by not pleading guilty. *Baker*, 489 F.3d at 370. As a result, a judge who participates in plea discussions "is no longer a judicial officer or a neutral arbiter" but "an advocate for the resolution he has suggested." *Miles*, 10 F.3d at 1139. The rule equally ensures that a court's "impartiality and objectivity" is not "open to any question or suspicion" either "when assessing the voluntariness of a plea or presiding over trial when a negotiation fails." *Bierd*, 217 F.3d at 19. Given the high stakes, violating Rule 11's ban "almost inevitably seriously affect[s] the fairness and integrity of judicial proceedings." *United States v. Sanya*, 774 F.3d 812, 821 (4th Cir. 2014).

Crossing Rule 11's bright line demands a swift remedy. Courts across the country routinely deem even fleeting judicial involvement in plea discussions as plain error—even absent on-point precedent. *In re United States*, 32 F.4th at 597-98 (granting mandamus on "issue of first impression"); *Baker*, 489 F.3d at 373 (finding plain error despite lack of D.C. Circuit authority); *United States v. Bruce*, 976 F.2d 552, 555 (9th Cir. 1992) (same where existing Circuit precedent was "slim"); *see United States v. Harrison*, 974 F.3d 880, 882 (8th Cir. 2020) (plain error); *Sanya*, 774 F.3d at 822 (same); *Harrell*, 751 F.3d at 1241 (same); *Kyle*, 734 F.3d at 966 (same); *Tobin*, 676 F.3d at 1306 (same); *United States v. Adams*, 634 F.2d 830, 836 (5th Cir. 1981) (same); *see also United States v. Morales*, 801 F.3d 1, 10 (1st Cir. 2015) ("absence of a decision directly on point does not remove the potential for a finding of plain error"). The appropriate remedy for a Rule 11 error is typically to vacate any conviction and reassign the case to a new judge on remand. *See Harrison*, 974 F.3d at 883 (vacating and reassigning); *Baker*, 489 F.3d at 376 (same); *Harrell*, 751 F.3d at 1244 (same); *Kyle*, 734 F.3d at 966 (same); *Tobin*, 676 F.3d at 1310 (same); *Adams*,

634 F.2d at 843 (same).  Even before a conviction is final, courts grant interlocutory relief to cure violations of Rule 11's ban on judicial participation.  *See In re United States*, 32 F.4th at 597-98 (mandamus); *Werker*, 553 F.2d at 205 (same); *In re Benvin*, 791 F.3d 1096, 1104 (9th Cir. 2015) (per curiam) (mandamus and reassigning); *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc) (same).

### A.    The Court's November Notice Crossed Rule 11's Bright Line

The Court first crossed the line when it issued its November notice of its intention to reject the parties' agreement.  Rule 11(c)(3)(A) gives a court three options: "accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report."  Those are a "court's **only** options."  *United States v. Brooks*, 78 F.4th 138, 143 (5th Cir. 2023) (emphasis added).  Missing from that list is the option to issue a notice threatening to reject (but not rejecting) an agreement as too lenient.  *See* Dkt. 242 at 1.  The reason is obvious.  Such a notice can have only one result—the parties will renegotiate with the Court's notice as "the focal point of further discussions."  *Adams*, 634 F.2d at 835.  It is an unmistakable nudge for the parties to revise the agreement to please the court.  Rule 11 "is focused on" preventing those "pressures—blatant or subtle—that the judicial office brings to bear on the process of negotiating a plea."  *Kraus*, 137 F.3d at 457.

The record leaves no doubt that the notice crossed the line.  The inevitable consequence of any such notice is—and was here—to "initiat[e] a plea discussion," which by itself violates Rule 11.  *Bierd*, 217 F.3d at 18; *see Harrell*, 751 F.3d at 1239 (plain error where "court opened the door to plea-related discussions"); *United States v. Rankins*, 675 F. App'x 231, 235 (4th Cir. 2017) (per curiam) (similar).  The ensuing discussions were dedicated to satisfying the Court's desire for a more punitive sentence.  Notter Decl. ¶5; *see Harrell*, 751 F.3d at 1239 (plain error for court to

"shap[e]" plea).  It was a negotiation with the Court, not a negotiation between Mr. Diab and the government.  Notter Decl. ¶¶6-7.  And the Court's conditional "intent" to reject the agreement, made the Court an active and coercive participant in a way it would not have been had it merely rejected the agreement outright.  *Id.*  After all, before the parties signed the resulting amended agreement, the Court requested and received a draft of the agreement.  *See id.* ¶9; *cf. Kraus*, 137 F.3d at 456 (error to present plea proposal to court's clerk); *United States v. Ushery*, 785 F.3d 210, 218 (6th Cir. 2015) (suggesting it was plain error to allow plea negotiations in court's presence).  And the pressure from the Court's notice in fact caused Mr. Diab to "agree" to increase the punishment he would suffer.  Notter Decl. ¶7.  That is the exact harm Rule 11 aims to prevent.

That the Court may not have intended its notice to initiate and shape plea discussions is irrelevant.  "[T]here is no good motives exception to Rule 11."  *In re United States*, 32 F.4th at 594 (quotation marks omitted); *see Harrell*, 751 F.3d at 1240 (same).  Even where a court acts for the "laudable" reason of ***protecting*** a vulnerable defendant, Rule 11 admits no exceptions, and once a court crosses that bright line, the harm cannot be undone.  *United States v. Hemphill*, 748 F.3d 666, 675-76 (5th Cir. 2014).  For example, in *In re United States*, the judge "initiated substantive plea-related discussions" by reminding the parties that it disfavored appellate waivers.  32 F.4th at 592.  Though the judge was "motivated in good faith by its concern for defendants," the court of appeals granted mandamus, holding that it was "clear and indisputable" that the judge violated Rule 11 by initiating and shaping plea discussions and by expressing approval of "a hypothetical plea agreement" that lacked an appellate waiver.  *Id.* at 592-94.  The same is true here, and the same conclusion follows.

**B.     The Court Violated the Absolute Ban on Judicial Participation by Identifying an Acceptable Hypothetical Plea**

The Court crossed Rule 11's bright line again at the December 19 hearing by identifying a hypothetical plea agreement that it would accept.  *See* pp. 4-6, *supra*.  The law is clear and overwhelming:  "When a court indicates what it might find acceptable or unacceptable in a hypothetical plea deal, it has crossed the line."  Order Granting Recusal, *United States v. Germaine*, No. 3:17-cr-030010 (D. Mass. Oct. 18, 2018), Dkt. 157 (attached as Ex. A to Notter Decl.); *see Bierd*, 217 F.3d at 20 ("comments on . . . what [the court] perceives to be an appropriate penalty" violate Rule 11); *In re United States*, 32 F.4th at 592-93 ("court is prohibited from commenting on a hypothetical plea agreement that it would or would not accept"); *In re Benvin*, 791 F.3d at 1103 (similar); *Harrell*, 751 F.3d at 1239 (similar); *Kyle*, 734 F.3d at 963-64 (similar); *United States v. Serrano-Lara*, 698 F.3d 841, 844 (5th Cir. 2012) (similar); *Kraus*, 137 F.3d at 454 (similar); *United States v. Crowell*, 60 F.3d 199, 203-04 (5th Cir. 1995) (similar); *Miles*, 10 F.3d at 1140 (similar); *Adams*, 634 F.2d at 835 (court plainly erred by suggesting terms of plea); *Werker*, 535 F.2d at 204-05 (granting mandamus to prevent court from proposing acceptable sentence).

That is what the Court did here.  After rejecting Mr. Diab's plea, it stated:  "[T]he Court would accept an agreed-upon sentence substantially below the low end of the applicable guideline range but not a sentence without at least a number of months of incarceration, followed by some period of home confinement."  Dkt. 271 at 7:9-13.  It then set a deadline for the parties to submit a "further revised (C) plea" the Court would accept.  *Id.* at 7:14-19.  The Court's message was clear:  It rejected the parties' agreement but would accept a hypothetical plea that sent Mr. Diab to prison for "a number of months," while implying that any punishment would be more severe if he

went to trial. *See Bierd*, 217 F.3d at 20 (threat of increased sentence after trial is error).[1]    That crossed Rule 11's bright-line prohibition on judicial participation in plea discussions.

Although the Court had a duty to explain why it rejected Mr. Diab's plea, it went far beyond that. As the government put it in real time, the Court was "saying it would accept a sentence" that "included a term of incarceration, followed by a period of home confinement." Dkt. 271 at 9:14-17. That was not the deal before the Court. It was a hypothetical deal that the Court, without invitation from counsel, identified as one that it would accept. *Cf. Kraus*, 137 F.3d at 454 (error even when invited by counsel's questions). The parties knew that. That is why they then "attempt[ed] to modify the plea agreement to include a term of months of incarceration" as the Court proposed. Dkt. 259 ¶4 (joint status report); *see also* Dkt. 273 ¶3 (the "Court ordered the parties to submit by December 23 a further revised plea agreement acceptable to the Court or to set the case for trial"). Case after case holds that such judicial involvement "crosses over the line established by Rule 11." *Kyle*, 734 F.3d at 963; *see In re United States*, 32 F.4th at 592 (same); *In re Benvin*, 791 F.3d at 1103 (same); *Harrell*, 751 F.3d at 1239-40 (same); *Kraus*, 137 F.3d at 454 (same); *Crowell*, 60 F.3d at 203-04 (same); *Miles*, 10 F.3d at 1140 (same).

The facts here establish a Rule 11 violation even more obvious than those other courts have held to be plain error. Take *Kyle*. The judge there rejected a Rule 11(c)(1)(C) plea as too lenient

---

[1] The Court made clear that it viewed the "sentencing guideline range of 15 to 21 months" as "accurately reflect[ing]" the offense. Dkt. 271 at 5:13-15. It also implied even that sentencing range (which included no loss enhancement) may be too low given the Court was "not persuaded by the parties' assertion that there was no intended or actual loss" and that the "sentence imposed by this Court ought to reflect the harm that occurred." *Id.* at 5:20-21, 6:16-20. Yet in identifying a hypothetical plea deal the Court would accept before December 23, the Court said: "[T]he Court would accept ***an agreed-upon*** sentence substantially below the low end of the applicable guideline range but not a sentence without at least a number of months of incarceration." *Id.* at 7:9-12 (emphasis added). The message was that any sentence after trial (or on a later plea) would be substantially more severe than the hypothetical plea the Court would accept before December 23.

and then, at counsel's invitation, made off-the-cuff remarks about what sentence would be appropriate, though disclaiming that the court could not "get[] involved" and that the decision rested with the defendant. 734 F.3d at 960-61. The court of appeals held that those "judicial remarks directed to future or ongoing plea negotiations 'which suggest what will satisfy the court transform[ed] the court from an impartial arbiter to a participant in the plea negotiations'" and constituted a plain error that so eroded the "fairness, integrity or public reputation of judicial proceedings" to warrant post-conviction vacatur and reassignment to a new judge. *Id.* at 965-67. The Court here went even further. It dictated the terms of an acceptable plea in prepared remarks without invitation from counsel, without disclaiming participation, and without reiterating the decision rested with Mr. Diab. *See* pp. 4-6, *supra*. And it then imposed a tight deadline for Mr. Diab to consider the Court's proposed plea. If the remarks in *Kyle* were plain error, the remarks here necessarily are too.

Case after case makes the same point. In *Schneider*, the judge rejected a Rule 11(c)(1)(C) plea as too lenient and made off-the-cuff remarks that he would "sentence [the defendant] within the guidelines" range. 40 F.4th at 851. The court of appeals held that the judge's comment went beyond explaining why the parties' agreement was insufficient and was "plain error" because it indicated the court would accept a plea "of at least a certain level of severity and within a particular range." *Id.* at 854.[2] *Harrell* similarly did "not hesitate" in holding that the judge plainly erred by inviting the parties to engage in plea discussions and suggesting a sentence lower than what government had previously offered. 751 F.3d at 1239-40. In *Miles*, the court of appeals held it was plain error for the district court to reject a Rule 11(c)(1)(C) plea and then (at counsel's

---

[2] For reasons unique to *Schneider* and irrelevant here, the court of appeals held that the plain error did not affect the defendant's substantial rights. *See* 40 F.4th at 855-56.

invitation) suggest that "another 20 years would be necessary before it would accept an agreement." 10 F.3d at 1141. *Tobin* found plain error where the judge merely made a series of comments to the effect that the defendants should "think" about plea discussions and that the court would "like to see" the discussions begin. 676 F.3d at 1305-07. The error here is equally plain—if not more so.

That Mr. Diab did not plead guilty on the terms the Court identified is irrelevant. Rule 11's ban on judicial involvement in plea discussions equally protects "a defendant who pleads not guilty." *Adams*, 634 F.2d at 840. The error is the "participat[ion]" itself. Fed. R. Crim. P. 11(c)(1). That error, once made, destroys the court's actual or perceived impartiality; the judge "is no longer a neutral arbiter." *Tobin*, 676 F.3d at 1303-04; *see Hemphill*, 748 F.3d at 676 ("once a court has exerted pressure on a defendant it is difficult, if not impossible, to undo the coercive effects of that pressure"). The Court can no longer be seen to impartially "assess[] the voluntariness of a plea *or* presid[e] over trial when a negotiation fails." *Bierd*, 217 F.3d at 19 (emphasis added). The error exists no matter what happens afterward. That is clear from the multiple decisions granting mandamus to remedy judicial participation even where no guilty plea was accepted and holding Rule 11 violations to be plain error even when raised for the first time after a jury trial. *E.g.*, *In re United States*, 32 F.4th at 588 (mandamus); *In re Benvin*, 791 F.3d at 1102-04 (same); *Tobin*, 676 F.3d at 1272, 1306 (plain error where defendant went to trial).[3]

---

[3] Nor is it relevant that no plea offer was technically "pending" when the Court intervened. *See Kyle*, 734 F.3d at 964 (rejecting that argument). "If the court itself initiates plea discussions, it is clearly still participating in them." *Rankins*, 675 F. App'x at 235; *see Bierd*, 217 F.3d at 18 ("initiating a plea discussion" violates Rule 11); *Harrell*, 751 F.3d at 1239-40 (plain error where "court opened the door to plea-related discussions"). That is what the Court did—both in its November notice and then again when it invited the parties to "submit by December 23 a further revised plea agreement acceptable to the Court." Dkt. 273 ¶3. Even if discussions had ended, the Court twice restarted them with the Court's preferred terms at the forefront. That is error.

The First Circuit's opinion in *United States v. Scott*, 877 F.3d 42 (1st Cir. 2017), removes any doubt that the Court crossed the line here. That case reached the court of appeals on plain-error review after the district court had rejected a Rule 11(c)(1)(C) plea because "any consecutive sentence of incarceration of less than 12 months" would be "insufficient." *Id.* at 45. The court's remark was confined to the deal presented by the parties, did not state what the court "would accept," and did not invite the parties to submit a further revised plea agreement. *See id.* at 48. Nevertheless, the First Circuit worried that the court "crossed the line . . . when it further explained that nothing less than twelve months' imprisonment . . . would be sufficient." *Id.* The court of appeals did not decide whether the remark amounted to plain error, because any plain error did not affect the defendant's substantial rights. *Id.* at 49. But the First Circuit left no doubt that the remark either ***did*** cross the line or came dangerously close even on deferential review, teaching future courts exactly where the line is. *Cf. United States v. Riggs*, No. 23-566, 2024 WL 3949101, at *3 (9th Cir. Aug. 27, 2024) (asking the parties "if there was 'any chance' " of a plea came "close to crossing the 'line' ").

The Court indisputably crossed the line set in *Scott*. On top of rejecting Mr. Diab's plea as too "lenient," not reflective of "the harm that occurred here," and involving too great of a "downward departure," the Court also stated that the case "warrants a carceral sentence," that the Guideline range "of 15 to 21 months accurately reflects" the offense, and that "a time-served sentence" is insufficient. Dkt. 271 at 4:5-10, 5:13-16, 6:16-20, 7:1-5. Had the Court stopped there, its remarks would have been like (though more extensive than) the one the First Circuit thought inappropriate in *Scott*. But the Court did not stop there. After accusing Mr. Diab of wrongdoing never alleged in the indictment, it continued to identify the terms of a hypothetical plea that it would accept and to invite the parties to reach an agreement containing those terms. *Id.* at 7:6-19.

It also implied that Mr. Diab would face more severe punishment if he went to trial.  *See* p. 11 n.1, *supra*.  *Scott* removes any conceivable doubt that the Court crossed the line here.

Similarly, where prejudice was lacking in *Scott*, it exists here.  The defendant in *Scott* stood by his guilty plea (without an agreement) even after the court rejected the parties' agreement; there were no further discussions.  877 F.3d at 45.  And the district court's lone remark came after commentary based in the record, not "rank speculation."  *Id.* at 49.  On plain-error review, the First Circuit couldn't conclude that the court's comment played any role in the defendant's thinking or created an appearance of impropriety.  *Id.* at 48-49.  The record here proves the opposite.  Where no further discussions were contemplated or occurred in *Scott*, the Court here both invited and sparked additional plea discussions that would not have occurred as they did but for the Court's involvement.  *See* Notter Decl. ¶¶9-12.  Where the comment in *Scott* was grounded in the record and thus created no appearance of impropriety, the Court's comments here were untethered from the record, as the government tried to explain, *see* pp. 4-5, *supra*, transforming the Court from "neutral arbiter" to "advocate" against Mr. Diab.  And most importantly, unlike in *Scott*, there is no dispute that the Court's involvement in plea discussions substantially affected Mr. Diab's decision-making.  Notter Decl. ¶¶9-12.  That is exactly the scenario that *Scott* says would warrant relief even on plain-error review (not applicable here).  877 F.3d at 48-49.

### C.    Nothing Short of Recusal Can Remedy the Violations

There is only one adequate remedy—recusal.  The Court's notice of "its intention to reject" the agreement injected the Court into negotiations by using the looming threat of rejection to get the parties to make the agreement more punitive.  *See* pp. 2-4, *supra*.  It made the discussions that followed a negotiation with the Court, not the government.  *Id.*  And it forced on Mr. Diab the impossible choice of either risking a rejected plea or preemptively (and perhaps unnecessarily) increasing his own punishment to satisfy the Court.  *Id.*  More than that, the Court's notice ***in fact***

coerced Mr. Diab into an agreement he otherwise would not have agreed to. *Id.* Absent recusal, such coercion will "taint[ ] everything that follow[s]." *United States v. Cano-Varela*, 497 F.3d 1122, 1134 (10th Cir. 2007). Nothing else can "undo" the lingering "coercive effects" of the Court's participation. *Hemphill*, 748 F.3d at 676.

Nor could anything short of recusal cure the errors at the December hearing. Once the Court rejected the plea agreement, Mr. Diab was supposed to have a choice to proceed with sentencing without an agreement, to withdraw his guilty plea, or attempt to reach another agreement with the government. *See* Fed. R. Crim. P. 11(c)(5) (listing options); *Scott*, 877 F.3d at 47-48 (noting these options). By participating in plea negotiations, the Court denied Mr. Diab the right to make that choice "free of any actual or apparent intervention by the court." *Kraus*, 137 F.3d at 458. It reduced Mr. Diab's choice to either "pleading guilty" on terms he otherwise would not have accepted "or taking his chances at trial in front of a judge who seemed already to have made up his mind about [his] guilt." *United States v. Barrett*, 982 F.2d 193, 195 (6th Cir. 1992). That "is the kind of choice Rule 11 was designed to eliminate." *Id.* Only recusal will remove the specter of judicial coercion and restore Mr. Diab's rights to freely decide for himself how he wishes to plead.

Recognizing that judicial participation taints all further proceedings, district courts have recused when facing similar motions. In *Germaine*, for instance, Judge Mastroianni had commented that he deemed the parties' agreed-on sentence insufficient but "would consider imposing . . . a sentence of 45 years." Recusal Motion 2, *Germaine*, Dkt. 154. Judge Mastroianni recognized that he "crossed the line" by indicating "what [he] might find acceptable or unacceptable in a hypothetical plea deal." Recusal Order, *Germaine*, Dkt. 157 (Notter Decl., Ex. A). Recusal was thus appropriate "to maintain the integrity of the process." *Id.* Other judges

in this Circuit and elsewhere have done the same. *See United States v. Rosario-Camacho*, 282 F. Supp. 3d. 449, 457-59 (D.P.R. 2017) (recusing after commenting on an acceptable deal when rejecting Rule 11(c)(1)(C) plea); *United States v. York*, 274 F. Supp. 2d 1347, 1351 (M.D. Ga. 2003) (same). These courts have rightly understood that "there is too much at stake" to risk tainting all future proceedings. *York*, 274 F. Supp. 2d. at 1351. Given those stakes, even a "non-frivolous" argument that the court "crossed the bounds of Rule 11" merits recusal. *Rosario-Camacho*, 282 F. Supp. 3d at 458. The clear and indisputable violations here more than merit recusal—they demand it.

That recusal is required is also evident from the appellate practice of reassigning cases on remand after finding a Rule 11 violation. *Cf.* L.R. 40.1(*l*)(1) (reassignment presumed when case returned on remand). That unanimous practice recognizes that a new judge is needed to vindicate "the prophylactic scheme established by Rule 11 and to prevent the possible misimpression created by the district court's participation." *Harrell*, 751 F.3d at 1241 (brackets omitted); *see Kyle*, 734 F.3d at 967 ("appearance of justice" requires reassignment); *In re Benvin*, 791 F.3d at 1104 (same); *Kraus*, 137 F.3d at 458 (similar). That is true even where an appellate court has "no doubt whatsoever" of the district court's impartiality. *Kraus*, 137 F.3d at 458. Recusal is thus the absolute minimum remedy required for the Rule 11 violations here.

## II.    SECTION 455(a) INDEPENDENTLY REQUIRES RECUSAL

A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a). Recusal is mandatory if "an objective, knowledgeable member of the public" could find from the facts "a reasonable basis for doubting the judge's impartiality." *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001). Under §455(a), there is no "duty to sit." *United States v. Chantal*, 902 F.2d 1018, 1023 (1st Cir. 1990).

Rather, "any reasonable doubts about the partiality of the judge ordinarily are to be resolved in favor of recusal." *In re United States*, 441 F.3d 44, 56 (1st Cir. 2006).[4]

That standard is amply satisfied here. In its November notice, the Court purported to have formed an "intention to reject" Mr. Diab's plea after considering "the sentencing factors enumerated in 18 U.S.C. § 3553(a)." Dkt. 242 at 1. But the Court could not have done so. The first § 3553(a) factor that every court "shall consider" is the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). As of its November notice, the Court knew nothing about Mr. Diab as a person. The presentence report hadn't been prepared, let alone shared with the Court. Nor had the parties submitted sentencing memoranda. Yet without that critical information, the Court had apparently made up its mind about the type of person Mr. Diab was. Such willingness to make up its mind on incomplete information certainly offers an objective observer "a reasonable basis for doubting the judge's impartiality." *In re Boston's Children First*, 244 F.3d at 167.

The December hearing offers further reason for doubting the Court's impartiality. At the hearing, the Court accused Mr. Diab of wrongdoing nowhere alleged in the indictment. The indictment charged a scheme to fraudulently obtain payment processing services. Dkt. 150 ¶ 26; *accord* Dkt. 255 at 1. There is no allegation of a scheme to obtain loans. Yet the Court accused Mr. Diab of conspiring to "fraudulently induce[ ]" banks "to loan money to disreputable borrowers." Dkt. 271 at 4:11-16. Nor did the indictment (or anything else) allege that Allied Wallet was "engaged solely in illegal criminal conduct" or that Mr. Diab's entire "salary was ill-

---

[4] The facts underlying the Court's Rule 11 violations also raise "reasonable doubts about the [Court's] partiality" and thus warrant recusal under § 455(a) even if those facts do not amount to a Rule 11 violation. *In re United States*, 441 F.3d at 56. For brevity, Mr. Diab does not repeat that discussion here.

gotten," as the Court alleged. *Id.* at 5:4-12. Worse, despite recognizing there was no supporting allegation or evidence, the Court accused Mr. Diab of harming "unnamed victims" never mentioned in the record. *Id.* at 4:23-5:3. Even after the government's repeated assertions that its multiyear investigation revealed no evidence that Mr. Diab intended or inflicted pecuniary harm, the Court persisted in its contrary belief. *Id.* at 5:20-6:3. Those beliefs, untethered from the record, convinced the Court that Mr. Diab belongs in prison and is "not deserving" of the "leniency" of a "time-served sentence[]." *Id.* at 5:13-14, 7:2-5.

Not one of the Court's allegations is true, but more importantly, nothing in the record could have led the Court to its beliefs. Whatever the source, it had to be "extrajudicial." It couldn't have been the record in this case. There have been no evidentiary proceedings. The Court has seen no evidence. The record and indictment are devoid of any of the allegations the Court made. Yet it persisted in its unfavorable view of Mr. Diab even after the government stated that the Court's beliefs lacked any support in evidence. *Cf. United States v. Pena*, 720 F.3d 561, 572 (5th Cir. 2013) (reassigning case after statements implied judge thought defendant "liable for wrongdoing" in an "unrelated matter"). At a minimum, the Court's predisposition against Mr. Diab was "founded on error," which itself warrants recusal. *United States v. Wells*, 879 F.3d 900, 938 n.17 (9th Cir. 2018) (recusal needed where sentencing statements "founded on error"). But more to the point, the Court's refusal to accept evidence in Mr. Diab's favor and condemnation of Mr. Diab for unalleged wrongdoing would give an objective observer reason to question the Court's impartiality.[5]

---

[5] That the Court has reviewed Mr. Diab's presentence report adds still more reason to doubt the Court's ability to impartially preside over further proceedings. *See Gregg v. United States*, 394 U.S. 489, 492 (1969) (noting "possible prejudice" of judge reviewing a presentence report before trial); *Werker*, 535 F.2d at 202 (knowledge of defendant's willingness to plead guilty itself affects

The Court's disparate treatment of Ms. Rountree adds further reason to question the Court's impartiality. Though certain facts distinguished Mr. Diab from Ms. Rountree, each defendant was identical in many respects. For example, they were both salaried employees of Allied Wallet. *See* Dkt. 251 at 10:7-18; Dkt. 271 at 10:5-18. Yet the Court treated ***only*** Mr. Diab's entire salary as "ill-gotten" profit. Dkt. 271 at 5:4-8. The presentence reports for Ms. Rountree and Mr. Diab both found no actual or intended loss, but the Court rejected that finding for Mr. Diab while accepting it for Ms. Rountree. *Id.* at 5:20-6:3. And despite identical charges, the Court accused Mr. Diab— but not Ms. Rountree—of harming unnamed victims and scheming to fraudulently obtain loans. *Id.* at 4:23-5:3. Such unexplained differential treatment on identical relevant facts is striking. And it would give an objective observer another reasonable basis to doubt the Court's impartiality. Under § 455(a), recusal is mandatory.

## CONCLUSION

The Court should grant the motion, recuse from all further proceedings, and request that the Clerk reassign the case consistent with Local Rule 40.1.

---

perception of judge's impartiality). Indeed, the Court appeared convinced by the allegation in the presentence report (an allegation Mr. Diab disputes) that Mr. Diab obstructed justice. *Cf. Hemphill*, 748 F.3d at 674-77 ("predisposition to believe" defendant "was guilty" required reassignment). Having already deemed Mr. Diab guilty both of alleged and unalleged wrongdoing, an objective observer would reasonably doubt the Court's ability to set aside those beliefs.

Dated:    January 27, 2025

Respectfully submitted,


/s/ Justin V. Shur

Maksim Nemtsev (Mass. Bar No. 690826)
20 Park Plaza, Suite 1000
Boston, MA  02116
Telephone: (617) 227-3700
menemtsev@gmail.com

Justin V. Shur (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  (202) 556-2000
Facsimile:   (202) 556-2001
jshur@mololamken.com

Kenneth E. Notter III (*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street, Suite 5350
Chicago, IL  60654
Telephone:  (312) 450-6700
Facsimile:   (312) 450-6701
knotter@mololamken.com


*Attorneys for Mohammed Diab*